IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DONNA NAIL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1238 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 15) and Defendant's Cross-Motion for Summary Judgment (Doc. 16). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **GRANTS** Plaintiff's motion and **DENIES** Defendant's motion. This case is **REMANDED** for proceedings in conformity with this opinion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Social Security Administration ("SSA") Commissioner

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as the defendant in this case. <u>See</u> 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 14, Ord. Dated July 12, 2017.

("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance under Title II and supplemental security income under Title XVI of the Social Security Act ("the Act").[3]

A.  **Medical History**

Plaintiff was born on August 15, 1962, and was forty-three years old on the alleged disability onset date of February 24, 2006.[4]  Plaintiff worked as a laundry worker at a nursing home until 2006.[5]

On March 8, 2013, Plaintiff was admitted to the Bayshore Medical Center with shortness of breath, where she was diagnosed with congestive heart failure; Palur V. Balakrishnan, M.D., ("Dr. Balakrishnan") noted it was not likely a case of acute congestive heart failure.[6] Dr. Balakrishnan also indicated that Plaintiff had new onset type 2 diabetes and hypertension.[7]  Plaintiff had been admitted to the emergency room one week prior with acute bronchitis.[8]  Dr. Balakrishnan noted that Plaintiff was obese, smoked one to two packs of cigarettes per day, and had an elevated

_____

[3]     In the hearing, Plaintiff modified her alleged onset date to February 2, 2014, which waived her Title II claim except with regard to statutory blindness, as the date last insured for that claim was June 30, 2029.  See Tr. of the Admin. Proceedings ("Tr.") 19, 40-41, 184.

[4]     See Tr. 39-40.

[5]     See Tr. 39-42.

[6]     See Tr. 239.

[7]     See id.

[8]     See id.

blood pressure of 130/80.[9]  An echocardiogram revealed a possible anterior infarct and the function of her left ventricle was moderately-to-severely impaired with an ejection fraction of thirty to thirty-five percent.[10]

Plaintiff saw Dr. Balakrishnan at Premier Heart Specialists for a series of follow-up appointments in 2013 and 2014.[11]  On March 19, 2013, Plaintiff told Dr. Balakrishnan that she was experiencing chest pain, difficulty breathing, leg pain, acid reflux, and a change in her ability to taste.[12]  On October 29, 2013, Plaintiff reported no shortness of breath, chest pain, dizziness, palpitations, or edema.[13]  Dr. Balakrishnan instructed Plaintiff to lose weight, continue her medications, and cease smoking.[14] Plaintiff underwent follow-up testing beginning February 25, 2014, which showed a mild concentric left ventricular hypertrophy and severely depressed systolic function in her left ventricular chamber.[15]  On February 26, 2014, testing revealed that Plaintiff had a very high triglyceride level impeding an accurate calculation

---

[9]  See id.

[10]  See Tr. 263, 267.

[11]  See Tr. 288-301.

[12]  See Tr. 299.

[13]  See Tr. 297.

[14]  See id.

[15]  See Tr. 292.

of her cholesterol.[16]  Plaintiff returned to Dr. Balakrishnan for treatment on March 28, 2014, complaining of a daily burning in her chest which resulted in nauseam, vomiting, and shortness of breath.[17]  Because Nexium had not resolved her symptoms, Dr. Balakrishnan modified her medication and ordered additional testing.[18]

On April 16, 2013, Plaintiff presented to Bay Area Diabetes and Endocrinology for a follow-up on her diabetes diagnosis.[19]  At the appointment, Plaintiff complained of "chest pain, weight loss, and cold[,] numb feet."[20]  Kuldip Kaul, M.D., ("Dr. Kaul") noted: (1) Plaintiff's history of hypertension, asthma, chronic obstructive pulmonary disease ("COPD"), and congestive cardiac failure; (2) the possibility of Plaintiff's having coronary artery disease; and (3) Plaintiff's blood sugar fluctuations.[21]  After this appointment, Plaintiff continued to seek treatment for diabetes from Dr. Kaul, who subsequently noted that she was "[d]oing well," had "fair control" over her blood sugar, was "[t]aking medications without difficulty," and had stopped smoking.[22]

---

[16]    See Tr. 290-91.

[17]    See Tr. 289.

[18]    See Tr. 289.

[19]    See Tr. 273-74.

[20]    Tr. 273.

[21]    See id.

[22]    Tr. 275-81.

Plaintiff underwent a ophthalmological/optometric consultative examination with Mark Mayo, M.D., ("Dr. Mayo") on August 1, 2014.[23] Plaintiff reported left eye blindness along with blurriness and throbbing pain in her right eye.[24]  Testing revealed no light perception in her left eye and, for distance without correction, 20/400 in her right eye, and with best correction, 20/150.[25] Close vision in her right eye was 20/80 with best correction.[26] Dr. Mayo concluded that, in addition to her left eye blindness, she had three-hundred-sixty-degree severe constriction with a small, central tunnel of vision in her right eye.[27]  Dr. Mayo requested follow up testing for her right eye and gave her a poor prognosis for both eyes.[28]  Plaintiff never sought follow-up testing.[29]

Plaintiff returned to Premier Heart Specialists on June 10, 2015, and September 9, 2015.[30]  Plaintiff reported no chest pain or shortness of breath at the June 10th appointment.[31] Dr. Balakrishnan found that she had intermittent leg claudication (cramping), nerve

---

[23]    See Tr. 302-03.

[24]    See Tr. 302.

[25]    See id.

[26]    See id.

[27]    See Tr. 303.

[28]    See id.

[29]    See Tr. 58-59.

[30]    See Tr. 360-70.

[31]    See Tr. 367.

pain in her feet, weak hands and feet, distal numbness, and pain in one or more joints.[32] Dr. Balakrishnan noted that Plaintiff had poor exercise habits, engaged in "normal activities of daily living," and had normal balance, gait, and stance.[33] Plaintiff was instructed to continue her medications, lose weight, and return for a follow-up in two months.[34] On September 9, 2015, Plaintiff presented with shortness of breath and dyspnea.[35] Dr. Balakrishnan did not record any other symptoms, remarking that Plaintiff had poor exercise habits and engaged in normal activities of daily living.[36] Plaintiff was instructed to continue her medication and return for a follow-up in three months.[37] Dr. Balakrishnan additionally noted that Plaintiff was seeing a kidney doctor who reduced some medications and tested her for kidney failure.[38]

Plaintiff returned to Dr. Kaul on January 15, 2015, to follow up on her diabetes.[39] Plaintiff was sixty-five inches tall, weighed one hundred and eighty-three pounds, and had a blood pressure of

---

[32]    See Tr. 367-68, 370.

[33]    Tr. 368-69.

[34]    See Tr. 370.

[35]    See Tr. 360.

[36]    See Tr. 360-61.

[37]    See Tr. 363.

[38]    See Tr. 361.

[39]    See Tr. 373-400.

124/70.[40]  Plaintiff's blood sugar levels were elevated at home, she was not experiencing hypoglycemia, and her thyroid function was normal.[41]  Dr. Kaul reported that Plaintiff was "[t]aking medications without difficulty."[42]  On February 26, 2015, Plaintiff was reportedly "doing well," still "[t]aking medications without difficulty," and had "better control" over her blood sugar.[43]  On May 29, 2015, Dr. Kaul made a similar report about Plaintiff, but noted that her creatinine level was elevated.[44]  Plaintiff returned on June 26, 2015, and Dr. Kaul made similar findings, and, additionally found that Plaintiff's potassium levels were elevated.[45]  On July 24, 2015, Plaintiff's creatinine and potassium levels were elevated, and she continued to have no difficulty with her medications or blood sugar.[46]  On September 17, 2015, Dr. Kaul reported that Plaintiff's blood sugar and creatinine levels remained elevated, but that she was "doing well" and her diabetes was controlled by medication.[47]  A physical examination revealed

---

[40]   See Tr. 399.

[41]   See id.

[42]   Id.

[43]   Tr. 397.

[44]   See Tr. 392.

[45]   See Tr. 387.

[46]   See Tr. 382.

[47]   Tr. 377.

that she was of average build and had a stable weight.[48]  Plaintiff
was instructed to continue her medications and put more effort into
working on her diet.[49]

Plaintiff saw her primary care physician, James Incalcaterra,
M.D., ("Dr. Incalcaterra") on August 12, 2015, because she was
experiencing more shortness of breath than usual.[50]   Due to
Plaintiff's increasingly poor results on kidney tests, Plaintiff
was diagnosed with stage three (moderate) kidney disease, and Dr.
Incalcaterra referred her to a nephrologist.[51]   Dr. Incalcaterra
noted that her motor strength was normal.[52]

Plaintiff saw nephrologist Tahir Hafeez, M.D., ("Dr. Hafeez")
for the first time on August 31, 2015.[53]  Dr. Hafeez explained that
Dr. Incalcaterra referred Plaintiff due to elevated potassium and
creatinine levels, as well as low blood pressure.[54]  Plaintiff did
not have any specific complaints at the appointment, but stated
that she experienced dizziness when her blood pressure was low; at
the appointment her blood pressure measured at 77/59 and 86/52.[55]

---

[48]   See id.

[49]   See id.

[50]   See Tr. 416-17.

[51]   See Tr. 416.

[52]   See id.

[53]   See Tr. 410.

[54]   See id.

[55]   See Tr. 410.

Dr. Hafeez noted that she had a normal gait, strength, and vision, and that she would walk to exercise.[56]  Dr. Hafeez concluded that she had stage three kidney disease and that her decreased kidney function was secondary to renal perfusion caused by her low blood pressure.[57]  Plaintiff's medication was adjusted.[58]  On September 14, 2015, Plaintiff had no new issues, and her blood pressure was elevated.[59]  Dr. Hafeez concluded that her kidney disease was stage four (severe).[60]  Plaintiff followed up on October 19, 2015, where she reported no new issues.[61]  Dr. Hafeez stated that she was not experiencing any blurriness or loss of vision, no tingling or numbness, and no shortness of breath.[62]  Overall, Dr. Hafeez concluded that her chronic kidney disease was stage three and stable.[63]

**B.  <u>Application to SSA</u>**

Plaintiff applied for disability insurance benefits on May 22, 2014, and supplemental security income on February 2, 2014,

---

[56]    <u>See</u> Tr. 411-12.

[57]    <u>See</u> Tr. 412.

[58]    <u>See</u> <u>id.</u>

[59]    <u>See</u> Tr. 406.

[60]    <u>See</u> Tr. 408.

[61]    <u>See</u> Tr. 402-05.

[62]    <u>See</u> Tr. 402.

[63]    <u>See</u> Tr. 404.

claiming a disability onset date of February 24, 2006.[64]   In a
disability report dated May 22, 2014, Plaintiff claimed that
congestive heart failure, diabetes, and her blind left eye limited
her ability to work.[65]   Plaintiff also indicated that her highest
level of education was ninth grade.[66]   In a later report from
September 11, 2014, Plaintiff answered that her condition had an
effect on household chores and driving, and that she had become
more limited in these areas.[67]   On November 4, 2014, Plaintiff
reported that: (1) her daughter had assumed responsibility for
cooking and cleaning; (2) it took her longer to groom herself due
to the need to take breaks; and (3) she had stopped going to the
grocery store, driving, and spending time with friends.[68]

        In a function report dated June 7, 2014, Plaintiff reported
that she could only clean the house for around a minute before
losing her breath, after which she would lay down for about half
the day before she felt better.[69]   Plaintiff stated that her
conditions impeded her ability to work, walk, sleep, complete
household chores, and care for her family.[70]   Plaintiff did not

---

[64]     See Tr. 146-168.

[65]     See Tr. 187.

[66]     See Tr. 188.

[67]     See Tr. 217.

[68]     See Tr. 226.

[69]     See Tr. 204.

[70]     See Tr. 203-04, 207.

prepare meals or complete chores because if she stood up for too long, she would experience shortness of breath and dizziness.[71] Plaintiff's daughter would complete the household chores for her.[72] Plaintiff could go grocery shopping or leave the house if she was driven by someone else.[73] When she went grocery shopping, she rode in the electric cart at the store.[74] For her interests, Plaintiff reported that she would watch television and talk on the phone.[75] Plaintiff noted that her conditions affected lifting, walking, standing, kneeling, climbing stairs, completing tasks, concentrating, and following instructions, but not seeing or understanding.[76] Plaintiff noted that she finished what she started.[77]

In the process of her application to the SSA, Plaintiff's treating physician, Dr. Balakrishnan, filled out several residual functional capacity questionnaires on May 28, 2014, February 10, 2015, and December 22, 2015.[78] All three forms indicated the same

---

[71]    See Tr. 205.

[72]    See id.

[73]    See Tr. 206.

[74]    See id.

[75]    See Tr. 207.

[76]    See Tr. 208.

[77]    See id.

[78]    See Tr. 285-86, 328-29, 419-20.

physical limitations.[79]  Dr. Balakrishnan noted that Plaintiff's
symptoms constantly impacted her ability to focus on work-related
tasks and that she would need would need additional breaks during
the work day.[80]  Dr. Balakrishnan found that Plaintiff could: (1)
walk half a block at a time without pain; (2) sit for fifteen
minutes at a time; (3) stand or walk for fifteen minutes at a time;
(4) sit for one hour in an eight-hour work day; (5) stand or walk
for one hour in an eight-hour work day; and (6) occasionally lift
less than ten pounds, but never lift more than ten.[81]  In terms of
breaks, Dr. Balakrishnan said that Plaintiff would need frequent
thirty-five-to-forty minute breaks during the work day, and she
would need to be able to change positions at will.[82]  During an
eight-hour work day, Dr. Balakrishnan reported that Plaintiff could
only use her hands to grasp, turn, and twist objects twenty percent
of the day, her fingers for fine manipulation twenty percent of the
day, and her arms for reaching twenty percent of the day.[83]  Due to
her conditions, Plaintiff would need to be absent more than four
days a month, according to Dr. Balakrishnan.[84]  Overall, Dr.
Balakrishnan concluded that Plaintiff's impairments were consistent

---

[79]    See id.

[80]    See Tr. 285, 328, 419.

[81]    See Tr. 286, 329, 419.

[82]    See Tr. 285, 328, 419.

[83]    See Tr. 286, 329, 419.

[84]    See Tr. 286, 329, 420.

with her limitations and symptoms, and that she was not able to sustain full-time employment.[85]

Defendant denied Plaintiff's applications at the initial and reconsideration levels.[86]  At the initial and reconsideration levels, the state agency physicians found that Plaintiff had no severe impairments, and no RFC determination was made.[87]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[88]  The ALJ granted Plaintiff's request and conducted a hearing on January 7, 2016.

## C.  Hearing

At the hearing, Plaintiff and a vocational expert, Lorie J. McQuade ("VE" or "McQuade"), testified.[89]  Plaintiff was represented by an attorney.[90]  At the outset of the hearing, the ALJ discussed Plaintiff's onset date with her attorney, amending it to February 2, 2014, as she was dropping all her claims under Title II except for statutory blindness.[91]

The ALJ questioned Plaintiff about her most recent work experience, which Plaintiff stated consisted of performing laundry

---

[85]    See Tr. 286, 329.

[86]    See Tr. 61-93.

[87]    See Tr. 61-67, 69-75.

[88]    See Tr. 97-98.

[89]    See Tr. 37-60.

[90]    See Tr. 38.

[91]    See Tr. 39-41.

work for a nursing home and concluded in 2006.[92]  Plaintiff ceased

working due to an injury in her left eye, and she testified that

she was fully blind in her left eye.[93]  As to her other health

impairments, Plaintiff explained that she had diabetes, congestive

heart failure, chronic obstructive pulmonary disease ("COPD"), and

kidney failure.[94]  At the time of the hearing, Plaintiff's left arm

was sprained and in a sling due to slipping in water at her home.[95]

The last time Plaintiff was hospitalized took place in 2013

due to heart-related complications.[96]  During that hospitalization,

Plaintiff was diagnosed with congestive heart failure and

diabetes.[97]  Plaintiff's congestive heart failure had since been

resolved, but she said that she still experienced pain and

shortness of breath from it.[98]  Plaintiff utilized an inhaler to

address breathing issues related to asthma.[99]

During the day, Plaintiff alternated between sitting and

standing.[100]  Due to neuropathy in her feet caused by her diabetes,

---

[92]     See Tr. 41-42.

[93]     See Tr. 42.

[94]     See Tr. 42-43.

[95]     See Tr. 43.

[96]     See id.

[97]     See Tr. 43-44.

[98]     See Tr. 44.

[99]     See Tr. 45.

[100]    See Tr. 45-46.

Plaintiff could only stand for twenty minutes, and then she would sit for thirty to forty minutes before standing again.[101]  The ALJ commented that it appeared that Plaintiff could stand for around one-third of the day and sit for two-thirds of the day, to which Plaintiff agreed.[102]  Plaintiff testified that she could, at most, lift fifteen pounds.[103]  Plaintiff's daughter completed most household chores due to Plaintiff's breathing problems and neuropathy.[104]  Plaintiff stopped driving a year after her heart attack due to her vision impairment, pain, and breathing difficulties.[105]  In terms of potentially returning to work as a laundry worker, Plaintiff explained that due to her inability to stand for long periods, she would have difficulty completing such a job, and, that even if she were able to sit, it would still be difficult due to fatigue and other physical limitations.[106]

Plaintiff's attorney stated that Plaintiff's neuropathy symptoms were not often mentioned in the medical records and asked her if she was taking medication for it.[107]  Plaintiff responded that she took medication daily for neuropathy, but when she

---

[101]  See id.

[102]  See Tr. 46.

[103]  See Tr. 46-47.

[104]  See Tr. 52.

[105]  See Tr. 52-53.

[106]  See Tr. 53.

[107]  See Tr. 50.

informed her doctor it was not working well for her, he told her to take a second dose, which still was not making a difference in her treatment.[108]

Related to her kidney condition, Plaintiff took medication, that reduced her symptoms from stage four to stage three kidney failure.[109] Plaintiff also testified that she took blood pressure medication and a weekly insulin shot in her stomach for diabetes.[110] Plaintiff used her asthma inhaler every day.[111]

As to her eye-related limitations, Plaintiff testified that in addition to left-eye blindness, she continued to have problems with her right eye on a daily basis.[112] Plaintiff explained that she had blurry vision in her right eye every two to three hours when she strained her eye for too long from reading or other activities.[113]

---

[108]    See Tr. 51.

[109]    See Tr. 47-48.

[110]    See Tr. 48.

[111]    See Tr. 49.

[112]    See Tr. 42, 49.

[113]    See Tr. 50. Plaintiff stated that she was not able to read and also denied that she did not know how to read or that it was caused by the blurriness. This exchange between the attorney and Plaintiff was difficult to understand. It is repeated here:

ATTY:
Q: With regard to your vision, you indicated that the blurriness comes when you strain it too long.  What kind of things strain your eyes?
A: When I try to look at a paper or something or – -
Q: Okay.
A: – - when I'm doing something.
Q: If I were to give you a page of, you know, just regular typewritten paper, would you be able to read that?
A: No, sir.

16

The attorney asked Plaintiff about Dr. Balakrishnan's opinion from May 2014, which stated that she could only stand for fifteen to twenty minutes.[114]  Plaintiff elaborated that at that point in time, she was experiencing not only foot pain from neuropathy, but also shortness of breath from standing.[115]

At the conclusion of Plaintiff's testimony, the VE discussed Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[116]  The VE stated that Plaintiff's past relevant work met the Dictionary of Occupational Titles ("DOT") definition of a laundry worker, which the VE considered a light, unskilled position.[117]

The ALJ presented the following hypothetical individual:

For the purpose of some hypothetical questions, I'm going to ask you to assume, please, that we're always dealing with an individual approaching advanced age and currently who is 53; one who has a limited or eighth grade education; one who is literate; one who has the same vocational background as [Plaintiff] possesses.

Further assume, please, that, secondary to the diabetes, the COPD, and the chronic kidney disease, the hypothetical individual could stand and walk for four out

---

Q: Okay.  And that's because of the blurriness?
A: No, sir.  I just - -
Q: Okay.  You just couldn't read it?
A: No, sir.
Q: Meaning you don't know how?
A: No.

[114]    See Tr. 51.

[115]    See Tr. 51-52.

[116]    See Tr. 53-57.

[117]    See Tr. 53-54.

of eight and sit for four out of eight; would need the ability to be able to change positions at will, could lift and carry, push and pull, occasionally twenty and frequently ten; can never use ropes, ladders, or scaffolds; climbing stairs would be occasional. And the hypothetical individual would need to avoid concentrated exposure from fumes, noxious odors, dusts, mists, gas, as well as poor ventilation.[118]

The VE testified that such an individual could not perform Plaintiff's past relevant work, pointing to Plaintiff's issues with fumes, odors, and dusts.[119]   However, the VE found that Plaintiff could perform positions such as ticket seller, office helper, and small products assembler.[120]

The ALJ then posed another hypothetical to the VE:

Hypothetical number two would be the same as hypothetical number one, in terms of non-exertional limitations. However, in terms of the exertional limitations, assume, please, that the hypothetical individual would be limited to sedentary work only. As to that assessment, if I did agree with it, could that hypothetical individual perform any of [Plaintiff's] past work?[121]

The VE stated that such an individual could not perform Plaintiff's past work.[122]  The ALJ inquired whether this hypothetical individual would "grid out," and the VE responded affirmatively.[123]

Plaintiff's attorney modified the hypothetical "to include

---

[118]    Tr. 54.

[119]    See id.

[120]    See Tr. 54-55.

[121]    Tr. 55-56.

[122]    See Tr. 56.

[123]    Id.

restrictions on the hypothetical individual's vision, consistent
with what she's testified today; that she has no vision in her left
eye and with the right eye would be unable to read more than
occasionally during the work day" and asked how that would impact
the available positions.[124]  The VE asked some follow-up questions
to the attorney regarding Plaintiff's vision.[125]  Plaintiff's
attorney explained that due to fatigue and strain in her eyes, she
would not be able to read on a consistent basis; the VE responded
that this would "compromise performance of those occupations such
that they might have a difficult time maintaining them," and that
there would not be replacement jobs that she could perform.[126]

The ALJ concluded the hearing by asking Plaintiff about an
August 2014 ophthalmology appointment, where it was recommended
that she receive further testing.[127]  Plaintiff explained that she
never attended a follow-up appointment and that the August 2014
appointment was the last time she saw an eye doctor.[128]

**D.  <u>Commissioner's Decision</u>**

On January 26, 2016, the ALJ issued an unfavorable decision.[129]

---

[124]     <u>Id.</u>

[125]     <u>See</u> Tr. 56-57.

[126]     Tr. 57.

[127]     <u>See</u> Tr. 57-59.

[128]     <u>See</u> <u>id.</u>

[129]     <u>See</u> Tr. 19-31.

The ALJ found that Plaintiff met the requirements of insured status through December 31, 2012,[130] and that Plaintiff had not engaged in substantial gainful activity since February 24, 2006, the alleged onset date.[131]  The ALJ recognized the following impairments as severe: "diabetes, chronic obstructive pulmonary disease, and stage III chronic kidney disease" but noted that her obesity, hypertension, left eye blindness, and congestive heart failure were not severe impairments.[132]  The ALJ found that, based on the medical evidence, these non-severe impairments only caused her minimal functional limitations.[133]  As to her visual impairment, the ALJ noted that "the condition affects only one side and [Plaintiff] has functional vision on the right" and that it was "termed nonsevere by the reviewing physicians at the State agency."[134]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal disorders described in the listings of the regulations[135] (the "Listings"), according to the ALJ.[136]  In particular, the ALJ considered Listings 9.00, 6.02, and 3.03 with

---

[130]    However, for her claim of statutory blindness under Title II, the date last insured is June 30, 2029.  See Tr. 19.

[131]    See Tr. 21.

[132]    Tr. 21-22.

[133]    See Tr. 22-23.

[134]    Tr. 22.

[135]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[136]    See Tr. 23.

regards to Plaintiff's diabetes, kidney failure, and asthma, finding that the medical evidence did not support a finding that she met any of these listings.[137]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and her medical treatment and stated that he followed the regulatory requirements as to both.[138] When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms.[139] Second, he evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] ability to do basic work activities," making a credibility finding for those symptoms that were not substantiated by objective medical evidence.[140]

The ALJ discussed Plaintiff's medical treatment, including records from: her March 9, 2013 emergency room visit; appointments with Plaintiff's cardiologist, Dr. Balakrishnan; her August 1, 2014 ophthalmological consultative examination; Plaintiff's appointments related to her diabetes; and visits with her nephrologist, Dr.

---

[137]    See id.

[138]    See Tr. 23-29.

[139]    See Tr. 26-29.

[140]    Tr. 26.

Hafeez.[141]

The ALJ explained that he gave the opinions of Dr. Balakrishnan some, but not controlling weight because they were "inconsistent with his own treating notes," contained "no explanation," conflicted with medical evidence presented, and were written years apart yet were exactly the same.[142] Some weight was given to the opinions of Dr. Hafeez and the state agency physicians.[143]

The ALJ engaged in a thorough account of Plaintiff's testimony regarding the symptoms that she experienced as a result of her impairments.[144] Specifically, the ALJ discussed the symptoms associated with Plaintiff's visual impairment, heart issues, asthma, kidney issues, neuropathy, and diabetes.[145]

He concluded: "After careful consideration, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[146]

---

[141]    See Tr. 23-29.

[142]    Tr. 29.

[143]    See id.

[144]    See Tr. 26-28.

[145]    See id.

[146]    Tr. 27.

The ALJ found Plaintiff capable of performing light work because she could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, push and pull within those exertional limitations, stand and walk for four hours in an eight-hour work day, and sit for four hours in an eight-hour work day.[147] The ALJ included the following limitations in Plaintiff's RFC: (1) changing positions at will; (2) never climbing ropes, ladders, or scaffolds; (3) occasional climbing of ramps and stairs; and (3) avoid concentrated exposure to fumes, odor, dust, mist, gases, and poor ventilation.[148]

The ALJ found that Plaintiff was not able to perform her past relevant work as laundry worker, as the VE testified Plaintiff's RFC would mandate that she avoid exposure to fumes, odor, dust, mist gases, and poor ventilation.[149]  The ALJ stated that Plaintiff was closely approaching advanced age as of the alleged onset date, had a limited education, and was able to communicate in English.[150] Because Plaintiff's past work experience was unskilled, transferability of job skills was not at issue.[151]  The ALJ noted that, if Plaintiff was able to perform a full range of light work,

---

[147]    See Tr. 26.

[148]    See id.

[149]    See Tr. 29.

[150]    See id.

[151]    See Tr. 30.

the Medical-Vocational Guidelines[152] directed a finding of not disabled.[153]    Considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform other jobs in the national economy, including positions such as ticket seller, office helper, and small products assembler.[154]

The ALJ concluded that Plaintiff was not disabled from February 24, 2006, through the date of the decision.[155]   Plaintiff appealed the ALJ's decision, and, on February 2, 2017, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[156] After receiving the Appeals Council's denial, Plaintiff sought judicial relief of the decision by this court.[157]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

---

[152]    20 C.F.R. Pt. 404, Subpt. P, App. 2.

[153]    See Tr. 30.

[154]    See id.

[155]    See Tr. 31.

[156]    See Tr. 1-6.

[157]    See Doc. 1, Pl.'s Compl.

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be

considered to determine whether [s]he can do other work. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  See Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its

26

review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) the ALJ misapplied the grid; (2) the ALJ's findings on Plaintiff's credibility are unsupported; and (3) the ALJ's hypothetical did not take into account Plaintiff's visual impairments.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  Grid

Plaintiff claims that she should be found disabled under the Medical-Vocational Guidelines, contending that she was illiterate and therefore falls under § 202.09, mandating a finding of disabled.  The ALJ found that Plaintiff fell under § 202.10 because she was closely approaching advanced age, was able to communicate in English, and had unskilled work experience, therefore meaning that she was not disabled.

In support of her argument, Plaintiff points to testimony where she said that she could not read a typewritten paper due to problems with her eyes.  However, when questioned if this meant that she did not know how to read, she answered "no."[158] Additionally, in her process of applying for benefits, Plaintiff

---

[158]    Tr. 50.

answered that she was able to speak, read, write, and understand English.[159]  Therefore, the ALJ did not commit legal error in finding that Plaintiff was literate and applying § 202.10 on the Grid.  The ALJ's decision was supported by substantial record evidence.

**B.  Credibility**

In March 2016, the Social Security Administration issued a new Social Security Ruling ("SSR") on the evaluation of symptoms in disability claims.  See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3 superseded the longstanding SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was entitled "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."  The stated purpose of SSR 16-3p is to "provide[] guidance about how [SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI of the Social Security Act (Act)."  SSR 16-3p, 2016 WL 1119029, at *1.  SSR 16-3p eliminated the word "credibility" from the policy.  See id.; Mayberry v. Colvin, No. G-15-330, 2016 WL 7686850, at *5 (S.D. Tex. Nov. 28, 2016)(unpublished).  District courts are divided on the issue of whether SSR 16-3p should apply retroactively.  Mayberry, 2016 WL 7686850, at *5 (collecting cases).  In Mayberry, the court pointed out that SSR 16-3p "was

_____

[159]    See Tr. 186.

28

designed to clarify rather than change existing law." Id.

SSR 16-3p explains that, pursuant to the regulations, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2. Even so, the ALJ cannot ignore statements of symptoms but, rather, must evaluate them according to the two-step process set forth in the regulations: (1) consideration of "whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce an individual's symptoms, such as pain;" and (2) evaluation of "the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an [adult's] ability to perform work-related activities." See id. The court must give deference to the ALJ's evaluation of the plaintiff's subjective complaints if it is supported by substantial record evidence. See Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Plaintiff does not contend that SSR 16-3p applies; Plaintiff cites SSR 96-7p in her motion. However, regardless of which SSR applies, the ALJ did err in his assessment of Plaintiff's complaints. One error resulted from the ALJ's assessment of Plaintiff's disability report, in which he states that Plaintiff said "she ha[d] no problems watching television daily and no

problem with finishing reading, movies, or chores."[160]  However, in
that function report, a disability report, and her testimony, she
stated that she could not finish housework and that her daughter
completed the household chores for her.  What the ALJ appears to be
referencing is a box which Plaintiff checked yes in response to a
question:  "Do you finish what you start?  (For example, a
conversation, chores, reading, watching a movie.)."[161]  The court
disagrees that this meant that she necessarily read or did chores;
nowhere in the disability report did she note that she read.  In
Aguilar v. Astrue, C.A. No. C-10-349, 2011 WL 3566863, at *11 (S.D.
Tex. July 28, 2011), the ALJ also mistakenly interpreted parts of
Plaintiff's questionnaire, and the court found it to be a
prejudicial error, especially because other records supported the
limitations that the ALJ claimed Plaintiff did not have.

Additionally, the ALJ also impermissibly "played doctor" in
his evaluation of Plaintiff's credibility.  In his opinion, the ALJ
wrote, "[a]n individual who could sit for only one hour a day and
stand for one hour a day, as reported by Dr. Balakrishna[n], and
needing an electric cart to go shopping, would exhibit some
deconditioning, atrophy, wasting, deformity, or paralysis.  Yet
every physical examination indicates normal gait, strength, and

---

[160]    Tr. 28.

[161]    See Tr. 208.

muscle tone."[162]  In <u>Frank v. Barnhart</u>, 326 F.3d 618, 621-22 (5th Cir. 2003), the Fifth Circuit looked at a similar statement from an ALJ,[163] finding that it was an error because the ALJ was "playing doctor," but that the error was harmless, because it was not heavily relied upon as there was sufficient medical evidence demonstrating that the plaintiff could work.

However, while these were errors made by the ALJ, substantial evidence that supports the ALJ's conclusion that Plaintiff was not entirely credible about the severity of her symptoms.  The ALJ pointed to inconsistencies in the evidence, including the extent to which she was affected by neuropathy and contradictions between the statements by Dr. Balakrishnan that Plaintiff could not perform many physical activities, and the medical records noting that Plaintiff performed normal daily activities and had a normal gait and stance.  Therefore, the ALJ's decision as to Plaintiff's credibility was supported by substantial evidence.

## C.  **Hypothetical**

Plaintiff contends that the ALJ erred by not incorporating her

---

[162]     Tr. 28.

[163]     The statement is as follows:

The undersigned finds it significant that despite allegations of disabling impairments since October of 1993, consultative examinations ... revealed no evidence of atrophy. It would seem reasonable that disabling symptoms that allegedly preclude any significant walking, standing, sitting, lifting, and carrying would result in observable findings of atrophy or muscle tone loss....

<u>Frank</u>, 326 F.3d at 622.

visual limitations into the hypothetical question, which resulted in an RFC that included no visual limitations. The ALJ considered Plaintiff's visual limitations non-severe. This was error because Plaintiff's visual limitations included a total lack of vision in her left eye and severely reduced tunnel vision in her right eye. But even if Plaintiff's visual limitations were properly deemed non-severe, they should have been incorporated into her RFC.

A claimant's RFC is her utmost remaining ability to work despite all of her limitations resulting from her impairment. See Villa, 895 F.2d at 1023 (5th Cir. 1990); 20 C.F.R. § 404.1545(a)(1). In evaluating the claimant's RFC, the ALJ is directed by the regulations to consider how the claimant's impairments affect her physical, mental, and other abilities, as well as the total limiting effects of all of her impairments. See 20 C.F.R. § 404.1545. The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that individual's functional capacity. Cf. Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990)(referring to a diagnosis as only part of the evidence that must be considered).

The regulations provide that the ultimate responsibility for determining RFC lies with the ALJ. 20 C.F.R. § 404.1527(d)(2); see also Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012). After arriving at an RFC that takes "into account all the restrictions reasonably warranted by the evidence," an ALJ may rely on the

response of a vocational expert to a hypothetical question on job availability as it relates to a person with the claimant's limitations. <u>Dominque v. Barnhart</u>, 388 F.3d 462, 463 (5th Cir. 2004). In order to serve as substantial evidence, the vocational expert's testimony must be based on a hypothetical question that incorporates all of the limitations recognized by the ALJ and must be subject to the claimant's cross-examination. <u>See Masterson v. Barnhart</u>, 309 F.3d 267, 273-74 (5th Cir. 2002)(citing <u>Boyd v. Apfel</u>, 239 F.3d 698, 707 (5th Cir. 2001)).

In this case, the hypothetical question did not reasonably incorporate all of Plaintiff's limitations. There is support in the record that Plaintiff had a severe visual impairment, as seen in the consultative examination conducted by Dr. Mayo. The ALJ recognized this fact in his questioning of Plaintiff in the hearing but failed to address the visual limitation in his RFC. Despite the fact that Plaintiff had limited vision in her right eye,[164] and the undisputed fact that Plaintiff was completely blind in her left eye, no visual limitations were included in the hypothetical question or RFC. This was error. While Plaintiff failed to follow up on her ophthalmological examination, the 2014 examination clearly indicated that Plaintiff had a severe visual impairment. It was unreasonable for these limitations to not be included in the RFC or hypothetical question.

---

[164] Her right-eye vision was described as a "three-hundred-sixty-degree severe constriction with a small central tunnel of vision." <u>See</u> Tr. 303.

**C.  <u>Disposition</u>**

The court finds that this case should be remanded so that the ALJ may pose a hypothetical question that properly includes all of Plaintiff's limitations.

## IV. Conclusion

Based on the foregoing, the court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant's motion for summary judgment.  This action is **REMANDED** for further proceedings in conformity with this opinion.

**SIGNED** in Houston, Texas, this 8th day of May, 2018.

_____
U.S. MAGISTRATE JUDGE